Our next oral argument is case number 201530964, Claimant ID number 100009540, BP v. BP Exploration & Production. The claimant is ARTCC. I'm delighted that the seal's been lifted. I think that that's an imposition on the public as well. Has the court – have we – the sealings are fairly – you're absolutely right. We have released a seal in this case. I'm asking, the sealing was – in all the cases was – we've had cases even before that we had that sealing uniformity order. So some cases at the beginning were not sealed as far as I know, and then there's a sealing period. And now we're – I guess we're going to individually consider what – Are there any other cases post that order that have lifted the seal, to your knowledge? Nobody. You know – no one knows. Okay. This is a failed business. Nobody cares about it. No one – okay. So I don't want to take your time about our court practice. So let's hear your argument. All right. On May 27, 2009, and for $461,232, which represented Art Chauvin's life savings, ARTC purchased the assets of Bayou Oyster, an oyster processing company located in Houma, Louisiana, from Crab Connection, LLC, a business entity owned by Harris Guidry. Crab Connection owns and is responsible for the liabilities. A new EIN was assigned to ARTCC. On July 15, 2009, ARTC assumed operations of Bayou Oyster. For 50 years, Bayou Oyster had purchased oysters from harvesters and dealers by the sack that shuck, process, and package the oysters for resale. Tell us – Is it Corner? Is that how you say it? Kerner. My apologies. Is that a Cajun pronunciation? Pardon me? Is that a Louisiana pronunciation? Pardon? No, that's not it. It's a Kraut pronunciation. Kraut. We stuck to the O-E. You're going through the history. And this is a sad tale, this long-running business and whatever, but it seems to me both on the filings we got today, maybe you filed them Friday, I don't know, and the argument made now you're running up against the fact that your client, previous attorneys, filed as a startup business. So how do you get over – Individually. Regardless. Okay. Once he got to the – I mean, what I hope you're responding to is how do we get over that. He did what he was doing. At the end of the day, when he went for the discretionary review, he filed as a failed existing business entity. I think you have to – had no lawyers, you have to give him a little bit of break, as the district court did when he finally found me. This is the correct award, though, if indeed it is a failed startup business. Yeah, we're not contesting that. Okay. And what is the total amount your client got, not just what we're talking about now? It's very close to the abattoir, which is $370,000. Okay. Now, he bought the company for $415,000, so he's completely out plus whatever he did. You're saying he bought the company, but you started by saying he purchased the assets of Bayou Oyster. Yeah. Isn't that correct? Yeah, he bought Bayou Oyster. In other words, there was no entity called Bayou Oyster that was trading. There was no entity. Is that the same as there was no company? Well, the company was Crabb Connection. All right. He didn't buy Crabb Connection. He bought the assets of Crabb Connection, including the assets Goodwill traded. Now, the alternative is to buy stock. BP says it's okay to do that, but in my own personal life, I call buying stock a used corporation. I call it ABC Corporation, already been chewed. That's the same source as you get from chewing gum and ethereses. You're going to get something. Had he done that, we wouldn't be here. He would have gotten his 3.2, and some creditor would be out there holding his hand out asking for money. Well, you don't get the 3.2 except on maybe an exotic formula, if opposing counsel is correct, but that's not really the point of the argument you're in right now. In other words, we need to go back and let Judge Barbier do a discretionary review and send it back with instructions to give us the 3.2. Now, tell me again, where exactly in the process did the idea that this was an existing business first appear? At the very beginning. That's where he started off. And then they refused at the beginning to accept it when he was represented by counsel. So he didn't know what to do. He just floundered around and filed stuff. But eventually, this is where it came out. Well, the decisions that were made on how much money he was owed that is being contested here, when during that post-initial process, when did he, your client, return to the idea that this was an existing business? You told me just a moment ago. Before he went for the discretionary review, and at the time... You don't mean at the time of his filing? All right. Before the claims appealed, he claimed it. Okay. Okay. And then to Judge Parbiot, he claimed it. Now, you know, I wouldn't have done that. Hopefully. One never knows. I wouldn't have did it if I had. But we're in a... These people went out of business in 15 days. And they had developed new territories in Boston where they were shipping oysters, like, as fast as they could chuck them. They had a really good business. It's estimated that they lost over $700,000, almost $800,000 just in revenues for the past year. This is really... So why do you get credit that it's commenced before November 1, 2008, instead of July 15, 2009? Okay. Bayou Oysters was in business for 50 years. There has to be a decision of whether you're going to take into consideration the fact that this is not a start-off company. It was a bought company. Now, I realize you just bought the assets, but that is a legitimate way of doing business. You bought the assets, you continue the company. It's a continuing business, not a failed start-up. He didn't go out and say, I, Art Chauvin, am going to form ARTCC, and I'm going to go and start Bayou Oysters. That's a good name, you know. Ryan Homer understands Bayou. What is the authority in the record that the new Bayou Oyster is the same entity, other than you telling us this was the idea of purchasing the assets? Well, BP basically admits it. Really? Where? Okay, let's see if I can find it. Okay. Okay, yeah, it is impossible because all the ARTCC enterprises, it was purchased Bayou Oysters assets. It did not purchase any shares of Bayou Oyster. In other words, if we say in the brief, everything like that, what I read to you is basically a distillation of what I said in the brief. The fact that they continued the business of Bayou Oyster just like they had before. They skidded down a little bit because they had such success in the Northeast. Now, as you know... It's page 17 of our opening brief. It talks about class counsel and the fact that BP and the settlement provided that both predecessors and successors would be banned, and that suggests that there's an intent to compensate predecessors when taken over by successors. And then there's an... Oh, I'm sorry, go ahead. There's an email exchange where... So Crabb Connection didn't maintain ownership of Bayou Oyster? No. I assume Mr Guidry went into retirement, took his money and did something else with it. So he exited. He built up his business, he sold for almost half a million dollars, and then he retired, as good Cajun people do. OK, we are not at the level to determine the correct amount of... And I'm not going to deal with the first issue of whether or not we have jurisdiction right now, because whether it's jurisdictional or whether it's not really jurisdictional, that's a different can of worms, and I assume the other people want to talk about that. But what my question is, Judge Barbier, under the system that you have, gets to decide whether he wants to consider an issue at all, and we have to decide that he abused his discretion in not considering an issue, and that's an interesting thing, because we become ancillary to a settlement process rather than the court must consider all the issues and then we decide if you abuse your discretion, how you consider them, but that's another topic. The question is, how did he abuse his discretion in not considering this? Just because it's an interesting thing and it affects your client and it seems unfair, how is that an abuse of the settlement process and we have to find that? One of the cases I cited that comes from this court, you basically said, we're getting too much business on things of repetition, and that Judge Barbier should consider cases that are capable of repetition, of which there are several cases in the pipeline on here, maybe one actually before the court. Well, couldn't he have said this is not a good case for this because the record's kind of messy with the client having all these representations that it was a failed business start-up. This is not the best case for this point, and that would be not abuse of his discretion. We don't know why, but that's certainly one reason why this wouldn't be the case picked up, wouldn't it? And so why wouldn't that be perfectly fine within his discretion? Okay, that's a good point. The issue is one of universal application under the Business Enterprise Laws. When does an entity start, and can you just by change of an EIN, now they've reversed that, or change of a corporate entity, does that lose everything that you bought or everything you had for up to 50 years? I mean, that's the basic deal here. This is a real simple situation, you know? Either you do or you don't. Now, this is something that's coming up, and so I would think, okay, if I were to own a court of appeals, I'd want the district court to chew on the issue and to do the research on it and to give me the benefit of it. If he needed an oral argument, if he needed more facts, he could remand, he does all kinds of stuff. You guys are supposed to get a complete record of what's going on. Now, it's a 40,000-page record, but it doesn't tell you anything about this. It doesn't tell you... This is like the sentencing guidelines used to be. You had no discretion. Here, somebody should have at least considered the 50-year history. They should have considered something else that was going on, and if it wasn't done in the claims committee or in the appeals process, it should have been done by Judge Barbier. And I get phone calls from people about similar cases, and I send people a brief and this kind of stuff. So this is not the only case you'll see. This may not be the best case, but I wasn't the lawyer at the time. Right, but if it's not the best case, he could choose to not pick it, and that's not an abuse of his discretion, because he has all this discretion that you all have given him in your agreement, which may not have been the... Whether that was a good idea or not is... He obviously thought there was enough merit to it that he let us get our little pigtails over the fence with the appeal. And also, there's obviously enough merit in the case that I'm here. Counsel, we'll probably hear from... We'll probably hear in just a second about jurisdiction. Do you want to address that? Sure. Whether we have the right to take this case? Okay. We know that this is a discretionary matter. What's a discretionary matter? We can take a case... On the part of Judge Barbier. Okay. So it comes to you with that momentum of discretion. Because he found excusable neglect, and so we would have to say... Yeah, and or a good cause. And, you know, Chauvin's just an individual. He did the best he could. The e-mails where he got beat up on and criticized and whatever were just the desperation. He came to me, and I'm sure everybody knows, I had an army accident. I was very ill during that period of time. I took the case simply because I thought it was the right thing to do. I had no idea what the merits were. What was the excusable neglect or good cause? He tried to get 18 lawyers. In other words, he went from lawyer to lawyer to lawyer to lawyer to lawyer. And he kept hearing that he didn't have a good claim. No, that they didn't want to represent him. We all know BP claims work burns one out. And a lot of these people just didn't want to fool with it. Thank you very much, sir. I have enough BP claims. And so I think that that's part of what happened. And so, you know, he eventually got a good lawyer who now feels better. And so I think that the court ought to try to entertain decent claims. It might not be a perfect claim, but to deal with it on the merits. I mean, that's our system, to give people breaks as long as they comply with even the exception. And I think this is the exception. All right. And that's what Judge Barbier did. He allowed the untimely. Yes. Now, he didn't give much in the way of reasons, but he read lots of stuff. Thank you so much. Thank you. I hope you're not burned out doing BP work. No, Your Honor. Not yet, in any event, Judge Southwick. May it please the court. I'm Jeff Clark from Kirkland & Ellis here on behalf of BP. And I have two preliminary points that go to questions that the panel had. And then let me talk about what I think are the three issues in this case. The two preliminary points are, first, I think, Judge Elrod, to your question about sealing, this is the first case to sort of talk about doing unsealing on a case-by-case basis. There was another case where the claimant, Sue Esponte, moved to unseal it. And then there was a recent argument in a case about the meaning of an exit ramp where the court asked, after argument was over, whether argument should be sealed. And the claimant took the position that they wanted that sealed, so the MP3 file was sealed. So that's kind of the current state of the world on sealing, and then what this court did in this case. The second preliminary point is that all of the three issues that I'm going to talk about, the two merits issues and the issue of whether there's appellate jurisdiction or not, all are suffused with an abuse of discretion standard of review. I'd submit to you that on the two merits issues, that runs in BP's favor, and I'd also submit to you that on the jurisdictional issue, we think we can surmount that. And going to your question, Judge Elrod, you know, I think it's precisely right. This case is a very bad vehicle to consider the merits issues that Art CC is presenting, and for that reason it was not an abuse of discretion for Judge Barbier to deny review. Okay. So with those preliminaries out of the way, let me turn to the three arguments that I have for you. The first one is that this was not a continuing business. The second argument is what I call my baseball arbitration point slash the seven times multiplier. Those are the two merits issues. And then I'll save the appellate jurisdictional issue for last, the third issue. So turning first to the issue of why there's not a continuing business, and Judge Graves, you asked the question about the dates. So if you look, you're going to see that Art CC represented on June 5, 2012, that it was a startup business. It did so again on October 3, 2012, and it did so a third time on February 2, 2013. So I haven't seen from the claimant or independently seen in the record at what point they shifted to make a different argument, but it was some point after February 2013. Where was the case in February of 2013? Inside the CSSP, Your Honor. And then the other question that the court had asked, Judge Graves, you again asked, was about the whole question of an asset sale versus an equity sale. And as Mr. Koerner conceded, there was a prior company, Crab Connection LLC, that was the prior entity, and the entity that was created to do the asset sale was the current claimant, Art CC. And that's a different entity, and it was an entity that wasn't created until sometime in the middle of, and there have been various representations by the claimant as to when, but sometime mid-2009. And the cut point, as Judge Elrod recognized, for whether you go with a failed startup business claim or a failed business claim, a continuing business, is November 1, 2008. So if your new entity is created in the middle of 2009, you qualify as a startup by virtue of the way the definitions work in Exhibit 6. Counselor, I know you're going to tell me where in all of that this doesn't matter, but let me ask you as a factual point. Was the business, was there an interruption in the business, or has this been a continuing until this disaster interrupted them? Well, I agree with you, Your Honor, that that's not a relevant consideration because of the text of the agreement. So we're not talking here about the actual business. You going to give me the facts, though? I'm sorry? You going to answer the question, though? What are the facts here? I don't think that there are any indications of the record one way or another, but I'd say for purposes of argument, you know, we are willing to concede that it was a continuing business. So you're saying that in the finer points that you've told us in the brief, there's no room for a business that has basically changed ownership however you want to, I'm going to use quibble for the third time this morning, and I shouldn't, no matter how you want to challenge the way in which it was done. Fifty-year business, maybe that's not quite right. Somebody takes it over in a particular way, wants to keep operating, expanding. There's no room, you're saying in the terminology of the settlement agreement, to say that is a continuing business regardless of the label matters because what you're looking for is what is this person standing there as a claimant out, and he's out the benefit of what he thought he was buying of a 50-year business. So you're saying door closed, clear from the language as you have said it in the brief. Yes. I think the answer to that question is door closed, and there's a reason for that. If you look at Exhibit 6 in Section Roman I in the definitions, it defines both the failed business term and the failed startup business term. Both of them begin by saying that a failed business shall be an entity, and then it says a failed startup business shall be an entity. An entity is a defined term in the settlement agreement, and there are two separate entities here, and there's really no getting around that. If the parties had wanted to create what happens fairly frequently in terms of liability continuations based on successor doctrine and the like, it would have used different terms. It would have said, it would have talked about successor claims and the like. Instead, it used the precise term entity, and here we have two entities, and the new entity, RCC, was not created until after the November 1, 2008, cut point. You don't think a good—excuse me, I just asked one. Go ahead. And didn't he avoid the liabilities of the predecessor entity? Yes, precisely because he— So he got the benefit of that. He got the benefit, right. He used the structure of an asset purchase to get a special benefit, which is to leave the liabilities behind. And, Your Honor, I suggest to you that the bidder comes with the suite on that, and how you measure that here is by looking at the text of Exhibit 6. Are there some claims that are being paid out where people are buying ongoing businesses during— I assume that they're—and they were treated as ongoing businesses, or do you take contrary positions in other litigation? So, Your Honor, the first question is I believe that there are, although none have reached my desk as of yet, and there's an internal policy on this kind of question that the CSSP has, but we haven't taken contradictory positions or inconsistent positions. And in terms of the 28J letter that was filed—excuse me if I get some water. In terms of the 28J letter that was filed by Mr. Kerner, it doesn't point to any situation in which successor liability was applied, where someone purchased an entire company and they were allowed to recover and BP took a contrary position. We haven't taken any contrary positions. I'll just say quickly, they point to two briefs BP filed. One was about whether a particular set of stores was excluded by the BP-branded fuel exclusion, which is totally extraneous to this case, and there are no inconsistent positions in there. And then there's another case about a produce-selling company. In that case, there was also another asset sale. It was structured that way. But the reason why that case fails is because the entity didn't exist. The asset sale didn't occur until after the spill had happened, and that's another reason, just an independent reason to bar the claim. And then there's a CSSP decision that's recent, but CSSP decisions aren't binding on this court. We're considering our appellate options, and in any event, we also didn't say anything inconsistent there. So if it said in the agreement that it was ongoing business and we value this business and we want to take it over and they didn't carve out the liabilities, then there's not you would be saying that they could prevail. I think we'd be looking at the specific questions and the facts in that case to determine whether it really was a startup entity versus a- What other facts? I thought I gave facts. They meant to make it an ongoing and they took the liabilities. They value this ongoing business. They never closed their doors during the time. Right. Let me put it this way, Your Honor. If there were all of the facts and circumstances that would be an ordinary successor concept and there were no countervailing facts on the other side, then, yeah, we wouldn't be taking a position contrary to a claimant like this. Here, though, in this particular situation, we're dealing with a claimant who's just running afoul of the language in the settlement agreement, just into the brick wall of what that language says, and they don't have any explanation about how to get around it. So the entity point I made is sort of the main point to make about why it's not a continuing business, as is the November 1, 2008, start point. But ART-CC repeatedly stated that it was pursuing a failed startup business. That's at ROA 347, 349 to 50, 108 to 16, 226 to 27, and the main one I think that it's very important to look at is ROA 111, because the main difference, there's a difference in the compensation mechanisms between startup claims and failed startup claims and other failed businesses' claims for ones that are continuing. The compensation methodology for the ordinary failed business that's continuing is to look at EBITDA, the earnings before interest, et cetera, approach, whereas the approach for a failed startup is to look at what actual equity is and also at sweat equity. And at ROA 111, you're going to find the claimant saying, here's my case for why sweat equity amounts to the number I'm claiming, and that's inherently to be making an argument, a clear argument that you think you're a failed startup and not that you think you're a failed continuing business. Is there any authority for the idea, though, and this is back on the entity point that you were making, that we look at the actual structure rather than what the text of the agreement was between the parties, that we look at what actually occurred rather than, you know. I would think, Your Honor, if there were some external law, right, that had a different set of purposes, whether it's a statute, whether it's a regulation, whether the agreement takes place in some specific common law backdrop, that you may be able to look beyond what the text of the agreement is. I was thinking about, like, the Castleberry Doctrine in Texas where you look beyond the text. I'm just trying to figure out if there's any possibility that even if it says entity, they could still prevail if the real realities of the situation were that it was an ongoing business. I don't think so, Your Honor, particularly given the choice of law provision in this agreement, which is to specify that it's governed by federal maritime law to be interpreted in light of the Oil Pollution Act of 1990, and there are no doctrines I'm aware of that would say that you can pierce what the text of the settlement contract would say, especially a settlement contract that's gone through as much process as this one has, right? Well, I'm not talking about – I guess I'm talking about what the agreement was at the time of the sale of the property, their agreement, not the text of the settlement agreement. Right. Yeah. Well, but I don't think that those questions are committed, first of all, in the first instance to the CSSP. You know, I think those are questions of external law. And, you know, let me make this point, right? If you wanted to pursue your rights under common law or if you thought there were some external source of doctrine that would help you to recover more against BP, you could opt out of the settlement. And RCC didn't opt out of the settlement. Once you don't opt out of the settlement, you're bound by the four corners of the settlement, and the text of that settlement says that, you know, you have to look at these definitions. And virtually all of these cases that this Court has decided at this point have all gone off on what the text of the agreement actually says, not based on, you know, some sort of, you know, rough justice kind of argument. So I'm appreciative, right, of the fact that Mr. Kerner took this case on, especially after so many other lawyers turned it down. I mean, that's the way the justice system is supposed to work. People are supposed to get represented if they're really that dogged and determined. But I do think that that's not a reason to set aside the text of the agreement and not enforce it. I appreciate your collegial tone today. In the earlier briefing and that sort of thing about citing the lawyer who didn't take the case, it appeared that there was not always such a collegial tone between the sides, and perhaps you'd like to comment on that. Sure. Well, maybe that's a good segue into the jurisdictional issue because, you know, from our perspective, we're frustrated to see that an appeal is filed at the 60-day mark, right, which is 30 days out of time, and then there's a decision that lets that be done without any explanation of why there was excusable neglect. And that also comes right in the face of this Court's holding in the Allied Steel case that in a situation in which you're seeking an extension retroactively, right, like you're filing to ask for the extension after the 30-day baseline period has already run, there's a heightened burden to show that you really have excusable neglect. We also point out how the advisory committee notes for FRAP 4, you know, say that this is a case to be in the excusable neglect pile because there was some fault, as conceded by the other side, as opposed to the good cause standard. And so, you know, after a claimant puts in, which I think is really quite remarkable, right, so many, an entire email record about all of the various counsel that were consulted and they decided not to take the case, you know, for merits reasons, saying that they thought the facts were even wrong, you know, and on and on. You know, I think that from a tonal perspective, maybe it's hard to, like, set out the gray letters of that email record for it not to sound harsh, but that's precisely why we don't think there was any basis here for saying that there was excusable neglect and why, you know, we think judgment. But you're not saying that you can be snarky just because you're frustrated. No, I'm not saying that. I think I'm saying more that I think that record kind of speaks for itself. Right, and you could let it speak for itself rather than elaborating. That's not a question. Go ahead. Okay. So returning to the last merits point, which is the one I haven't explained, that's the one about the baseball arbitration process. So the way the settlement agreement works is that when you're before the CSSP, you basically have to, you know, when you're in this appeal panel process, you have to submit that, you know, one side makes a proposal, BP makes a proposal, and the appeal panel can't decide, you know, to sort of pick a third approach. It has to decide between the two approaches that are put before it. And on those, you know, two approaches, the RCC company said that it was entitled to a seven times multiplier, and on that basis, that was their proposal. So now they've conceded that that's not the correct multiplier, but you can't undo time like that. The way the baseball process works is if you put before the CSSP appeal panel a faulty, you know, argument as to why you think you're entitled to some amount of money, then, you know, you're locked in at that point. You can't, you know, undo that later. And that's really an error that I don't think Mr. Kerner really has ever taken head on. I mean, to his credit, he's admitted that he looked, again, that there was some confusion based on previous representation or based on the claim of proceeding in pro par that, you know, there was a multiplier that they could use of seven. Mr. Kerner concedes that's not true anymore. And they can only use three, not seven, and therefore, your number is the number. Therefore, the only number that was legally consistent with the settlement agreement was BP's number. And, you know, that's an independent reason to affirm the decision below. So actually, Your Honor, I mean, if there are no further questions from the Court, I'm happy to cede back the rest of my time and rely on the briefs. Nothing further you want to say about jurisdiction? You know, on the jurisdictional issue, I made the higher burden point based on asking for the extension on a retroactive basis. And, you know, the factual issue behind that is really that they didn't start, Mr. Chauvin didn't start looking for a lawyer until after discretionary review was already denied. And he knew, as he's conceded, at the point he entered the process, that he knew he was going to need a lawyer to represent the corporation in court. And so, you know, his basic pitch is, once I, you know, learned that I was going to lose, then I went and looked for counsel. And I don't think that that's showing excusable neglect. You could have started earlier. And if you'd started earlier, you would have come across Mr. Kerner earlier. But this isn't technically jurisdiction like we normally think of jurisdiction because this is jurisdiction by contract procedures, really. This is not a normal appeal as right from a – this is an appeal that's through a contract mechanism. They gave definitions of times and different procedures. And so I don't know that it's jurisdictional in the sense of the court lacks authority. It's whether or not – it's still a contractual dispute. It's not under the rules, really. Your Honor, respectfully, I would push back on that, and I'd do it in this way. The 30-day limit to take an appeal from Judge Barbier once he denies discretionary review in FRAP 4, that is jurisdictional. And this Court's cases have repeatedly held that the 30-day deadline in FRAP 4 is jurisdictional and that while there's an exception that lets a judge, when there's excusable neglect or good cause, even though that's not applicable here, when that can be shown to extend the period. But FRAP 4 is put into the arrangement of the settlement. It's not normal. Isn't that right? They said that they would allow set appeals under the decision. He gets to decide whether to have the appeal first, and then there's a mechanism by which we can hear the appeal. Your Honor, now I see what you're getting at. So I want to distinguish between two issues. The first question is, was there a right to take an appeal from Judge Barbier's denials of discretionary review? And in a couple of cases that were decided, I think, in July 2015, the Court said that there was a right to do that because there had not been a clear elimination of an appeal right in the contract. That's correct. But I think that's a very different issue from the issue of once you've held that there is such a right to appeal, then you have to take that appeal within the specified time period. And the specified time period is to do it within 30 days, unless you can get an extension and show that there was excusable neglect. And the Court's cases have also said that you want to police that boundary because if you don't police that boundary kind of hard, you get into a situation where a 30-day jurisdictional period becomes a, you know, slips and slides into a 60-day jurisdictional period, and that's not what the rule drafters in FRAP 4 intended. What case holds that this would be not excusable neglect or cause? What case holds that? I don't think we didn't find any case that was exactly analogous, but neither did ART-CC. Perhaps we should defer to the judgment of the District Court. Your Honor, with that, I think that's a question for the Court, but we think that we have colorable grounds as to why there was no good explanation here for waiting too long. Thank you. Thank you, Your Honor. Even though BP may have taken pot shots, their counsel was very generous in extensions. As I know, he had been ill, but he was very, very professional, courteous in that regard. Counsel has been very professional today on both sides, and we appreciate that. Well, let's talk about the late appeal. Chauvin had Billy Bordelon as his lawyer all along, who was trying to help him and who just didn't want to go forward, and he was so stuck. It was unexpected. So he scrambled as much as he possibly could. What he does is admirable in some respects. It just shows what individuals can do in the United States if they really want to. I didn't want to take the case. He had to come sit down and look me straight in the eye and offer me oysters to take the case. Really, it's the truth. I just believe that we should give individuals a break on this kind of stuff. He got bad advice along the line. His reactions are the equivalent of bumper cars. All you try to do is shuffle around to try to get someplace. But I think the most important thing here is in 2014, there was e-mails, which I quoted in my reply brief, from BP's counsel. They state the distinction between stock sales and asset sales. The life of the entity continues to stock sale, whereas in asset sale, the assets are transferred to a different entity. More specifically in stock sale, the business essentially continues as is after the transaction. The buyer typically assumes ownership of the business name, retains the existing employee contracts and non-compete agreements, and retains the business's contractual obligation on the liabilities. But for an asset sale, a post-transaction entity is a new or different business where the buyer may lose the right to use the corporation's name. The asset sale voids existing employee contracts and non-compete agreements, and the buyer does not retain the prior contractual obligation of the pre-transaction business. Accordingly, it does not make a difference in evaluating a claim involving a change in ownership, whether the transaction was structured as a stock sale or an asset sale. That's what they said, and that's what I quoted. And it goes on for two pages, basically saying the same thing. Now, in the briefs that we pointed out in the 20HA letter, the facts are different, but it's what BP said in there that suggested they speak out of both sides of their mouth. Well, even if BP took that position, I mean, it doesn't stop the evaluating entity from looking at corporate law, does it? Yeah, but that's certainly persuasive. I mean, it should be persuasive. Logically, what's an entity? It's a business? I mean, is this by you or is this an entity that continued all the way until May 5th of 2010? Certainly, I think you could say so. I realize that there's some definitions that you have to take into consideration, but viscerally, it's an entity. The same people got in there with their oyster lids and their knives and opened up and filled up gallon containers. The same people ate them. Why wouldn't this just be an entity? This is a continuing problem. As I said, there are lots of cases like that. Any other questions, ma'am? Yes? That does it for me. Thank you very much, counsel. We appreciate your arguments in the case. Thank you very much. Have a good week.